# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6215 | **DATE** | 11/7/2002 |
| **CASE TITLE** | Intl Paper Co vs. Androscoggin Energy | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 11/21/2002 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** We grant IP's motion (Doc 70-1) for summary judgment as to liability under Count I, and we grant AELLC's motion (Doc 79-1) for summary judgment on Count II. IP's motion (Doc 94) to strike is denied. All other pending motions are denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 5 number of notices | Document Number |
| | No notices required. | | NOV 0 8 2002 date docketed | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | | 96 |
| ✓ | Docketing to mail notices. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | 02 NOV -7 PM 2:58 | NOV 0 8 2002 date mailed notice | |
| SCT | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INTERNATIONAL PAPER COMPANY, a New York corporation,

    Plaintiff,

vs.

ANDROSCOGGIN ENERGY LLC, a Delaware limited liability company,

    Defendant.

00 C 6215

DOCKETED
NOV 08 2002

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on three motions for summary judgment. Plaintiff International Paper Company ("IP") moves for partial summary judgment that Defendant Androscoggin Energy LLC ("AELLC") is liable on Count I of the First Amended Complaint (the "Complaint"). AELLC cross-moves for summary judgment on Count I and additionally moves for summary judgment on Count II. Additionally, IP moved to strike AELLC's Reply in Support of its motion for summary judgment as to Count II, or alternatively for leave to file a surreply instanter. On October 24, 2002, we granted the motion to file surreply instanter, and we hereby deny the motion to

strike. For the reasons set forth below, we grant summary judgment for IP as to liability under Count I and grant summary judgment for AELLC on Count II.

## BACKGROUND

IP has a mill in Androscoggin, Maine, that demands a source of electric power and steam for it to operate. In 1996 and 1997 AELLC and IP negotiated a project (the "Project") in which AELLC would construct, own, operate, and maintain a facility at IP's mill for the purpose of producing electric power and steam for sale to IP and electric power for sale to others. On May 12, 1997, AELLC's president, Michael Polsky, told IP that the price of steam could be "structured to remain stable and predictable using fixed price [gas] contracts." IP 56.1(a) Statement ¶ 6. Polsky further stated: "By arranging long-term gas supply and transportation contracts, we will assure reliability and stable pricing of steam to IP. By matching the steam pricing to gas pricing, we provide a higher degree of predictability of returns to project investors." *Id.* During the negotiations regarding the Project, AELLC informed IP that it had ten-year contracts with four different natural gas suppliers under which natural gas would be available at fixed prices with fixed escalations. AELLC also provided IP with copies of the four contracts with the natural gas suppliers. One of these contracts, the Rio Alto Contract, was entered into between AELLC and Rio Alto Exploration, Ltd. ("Rio Alto"). The Rio Alto Contract provided AELLC with approximately one-third

of the fixed price natural gas to be used for the Project. The price of the gas was relatively low and Polsky even referred to the fixed price as at a "historic low." IP 56.1(a) Statement ¶ 19.

On July 31, 1997, AELLC and IP entered into an Energy Services Agreement (the "ESA") under which AELLC would provide steam to IP for a period of twenty years. The price of the steam would be based, at least in part, on the average weighted delivered price of natural gas pursuant to AELLC's fixed price, fixed escalation contracts with the four natural gas suppliers.

On March 26, 1998, AELLC sent a letter to Rio Alto acknowledging that it had failed to satisfy certain conditions precedent to the Rio Alto Contract and requesting an extension of time in which to comply with the conditions precedent. Rio Alto responded to the letter on April 7, 1998, stating that because of AELLC's noncompliance, Rio Alto was giving AELLC thirty days notice that it would terminate the Rio Alto Contract on May 8, 1998. At that time, however, Rio Alto informed AELLC that it could avoid termination of the Rio Alto Contract by exercising its contractual right to waive all remaining conditions precedent prior to May 8, 1998. AELLC declined to waive them, and the Rio Alto Contract terminated on May 8, 1998. AELLC initiated an arbitration proceeding against Rio Alto to enforce the Rio Alto Contract, but the arbitration panel unanimously held that the contract was validly

terminated on May 8, 1998. AELLC allegedly never informed IP of the Rio Alto Contract termination until August 31, 1998.

On May 29, 1998, after the Rio Alto Contract was terminated but before IP learned of the termination, AELLC and IP executed Amendment No.1 to the ESA ("Amended ESA"), which readopted the ESA as of that date.

The ESA and, therefore, the Amended ESA contained representations by AELLC that there were no pending or threatened actions, suits, arbitrations or the like against AELLC that would materially and adversely affect AELLC. They also contained representations that AELLC was not in breach of any material contracts, and that AELLC would not terminate or modify its contracts with the natural gas suppliers without providing notice to, and seeking approval from, IP

Because of the termination of the Rio Alto Contract, AELLC has been and is likely to continue to purchase substitute gas at a higher price. Much of the increased price of gas available to AELLC has been passed on to IP in the form of increased steam prices. On October 10, 2000, IP filed suit against AELLC for breach of contract (Count I) and negligent misrepresentation (Count II) based on AELLC's alleged contractual and verbal misrepresentations with respect to the Rio Alto Contract. IP moves for summary judgment as to liability under Count I (the contract claim). AELLC moves for summary judgment on both counts.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). The moving party bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial. *Id.* The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence. *Id.* A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is with these principles in mind that we address the motions before us.

## DISCUSSION

I.  Choice of Law

Because this is a diversity action, we must apply the appropriate state law. With respect to the breach of contract claims and consistent with our previous ruling, we

apply Maine law. *See* February, 9, 2001, Order (applying Maine state law to IP's breach of contract claims). With respect to the negligent misrepresentation claim and consistent with our previous ruling, we also apply Maine law. *See* May 10, 2001, Order (applying Maine state law to IP's negligence claim).

## II. Count I: Breach of Contract

IP contends that AELLC breached three contract provisions. Two of the provisions, sections 2.02(e) and (f), make representations and warranties to IP that were allegedly false when made. The third provision, section 6.01(j), places certain obligations on AELLC which IP contends were violated.

A. Section 2.02(e) of the Amended ESA

In section 2.02 of the ESA, AELLC makes certain representations and warranties to IP as of an "Effective Date." The Effective Date for the ESA is defined in the ESA as "the date of execution of this Agreement by the parties." The ESA was executed on July 31, 1997. IP does not contend that any representations or warranties were false as of the Effective Date of July 31, 1997. Instead, IP contends that sections 2.02(e) and (f) were false as of an amended effective date of May 29, 1998. In response, AELLC argues that no representations or warranties were made on May 29, 1998, and, even if they were made, they were not false.

It is indisputable that AELLC and IP executed Amendment No. 1 to the ESA in which they "readopt[ed] the Energy Services Agreement in its entirety as of the new effective date of May 29, 1998, with no other amendments." AELLC argues that the "new effective date" did not replace the term "Effective Date" from the original ESA. AELLC offers extraneous evidence that the intention and effect of Amendment No. 1 was to change the date only for purposes of complying with Maine state law. To the contrary, Amendment No. 1 unambiguously states AELLC's and IP's intention:

> Whereas [IP] and [AELLC] wish to amend the Energy Services Agreement as of a new effective date of May 29, 1998, and to readopt the Energy Services Agreement as of the new effective date with no other amendments . . ..

The language is clear. The ESA is readopted with a new effective date of May 29, 1998. The representations and warranties contained in the original ESA were therefore made in the Amended ESA as of May 29, 1998. Additionally, Amendment No. 1 contains an integration clause, which AELLC admits supercedes "[a]ny contrary understanding by the parties not incorporated" into Amendment No. 1. *See* AELLC's Opp. at 14.

Section 2.02(e) represents and warrants:

> Except as disclosed in Exhibit 2.0, no suit, action or arbitration, or legal, administrative or other proceeding is pending or has been threatened against [AELLC] that would affect the validity or enforceability of this Agreement or the ability of [AELLC] to fulfill its commitments

> hereunder, or that would, if adversely determined, have a material adverse effect on the business or financial condition of [AELLC].

AELLC never disclosed anything in Exhibit 2.0. IP argues that the section 2.02(e) warranty was false when made because AELLC did not disclose the arbitration with Rio Alto. We disagree. The plain language of section 2.02(e) states that no arbitration "is pending or has been threatened against [AELLC]." The arbitration did not begin until July 22, 1998, after the representation was made. AELLC's (Count I) 56.1(a) Statement ¶ 12. IP denies that the arbitration was commenced on July 22, 1998, but offers no controverting evidence. We therefore deem it admitted that the arbitration commenced on July 22, 1998.

IP argues that even if the arbitration was not commenced as of May 29, 1998, it was still pending because it was imminent. We disagree. Pending has a clear meaning. An arbitration is pending only during the period of time *after* it is initiated and before it is resolved.

IP originally argued that, even if the arbitration was not pending, it had been threatened against IP and should have been disclosed. Despite IP's apparent abandonment of this argument, we will address the issue for clarity. AELLC was never threatened with arbitration by Rio Alto. It was AELLC that threatened Rio Alto. Thus, under the clear terms of section 2.02(e), no arbitration had been threatened against AELLC as of May 29, 1998. We find that AELLC did not violate section 2.02(e).

B.  Section 2.02(f) of the Amended ESA

We now address section 2.02(f), which represents and warrants:

> [AELLC] is not ... in breach of, in default under, or in violation of, any ... contract, or other agreement by which it is bound, except for any such breaches, defaults or violations which, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the business or financial condition of [AELLC] or its ability to fulfill its commitments hereunder.

IP claims that AELLC's noncompliance with conditions precedent in the Rio Alto Contract constituted a breach, default, or violation of that contract, thereby making AELLC's section 2.02(f) warranty false at the time it was made. We have previously held that conditions precedent, like other contract provisions, can be breached. *See* February 9, 2001, Order (citing Restatement (Second) of Contracts § 225(3); *Lynch v. Stebbins*, 142 A. 735, 736 (Me. 1928)). Thus, AELLC's noncompliance with the conditions precedent did indeed constitute a breach of the Rio Alto Contract.

AELLC argues that, even if it was in breach of the Rio Alto Contract, its section 2.02(f) warranty was not false because the loss of the Rio Alto Contract would not be expected to have a material adverse effect on AELLC. We disagree. The Rio Alto Contract would have provided AELLC with a ten year supply of natural gas at a fixed relatively low price. The fact that AELLC brought Rio Alto to arbitration in the hopes of saving the Rio Alto Contract indicates AELLC's own belief that the loss of that contract would have a material adverse effect. In fact, at the arbitration, AELLC

- 9 -

estimated its damages due to the to loss of the Rio Alto Contract to be "at least $42.7 million" and "as much as $65.4 million." IP's 56.1(a) Statement ¶ 45.

AELLC also defends its section 2.02(f) warranty on the irrelevant ground that it was not knowingly false. Ignorance is not a defense to a breach of warranty. *See Henderson v. Berce*, 50 A.2d 45, 50 (Me. 1946) ("The seller is responsible for a breach of warranty when he sells a thing as being of a particular kind, if it does not answer the description, the vendee not knowing whether the vendor's representations are true or false but relying upon them as true, whether the vendor acted wilfully or innocently.").

AELLC further defends on the ground that IP never relied on the representations and warranties contained in section 2.02(f). AELLC cites no authority for its proposition that one must prove reliance on an express warranty in a contract. Our own research indicates that Maine has never addressed this issue. One Maine case does hold that reliance must be proved in some breach of warranty cases. *See Phillips v. Ripley & Fletcher Co.*, 541 A.2d 946, 950 (Me. 1988) ("purchaser must show reliance on the affirmation in order to make out a cause of action for breach of warranty"). In *Phillips*, the court held that, with respect to an oral statement, reliance on the oral statement must be shown in order for the oral statement to be deemed an express warranty. *Id* at 949-50. The reliance requirement of *Phillips* is only relevant to whether or not an express warranty was created in the first place. *Id; see also Wikoff*

*v. Vanderveld*, 897 F.2d 232, 241 (7th Cir. 1990) (Recognizing that *Phillips*-type cases, which require reliance, are only "relevant to the question of whether an express warranty has been *created*."). *Phillips* is not on point with the present case in which the existence of the express warranty is not in dispute. Having determined that Maine has not yet addressed the issue, we hold that a plaintiff does not need to prove reliance upon an express written warranty that is part of the contract being sued upon. *See CPC Int'l Inc. v. McKesson Corp.*, 513 N.Y.S.2d 319, 323 (N.Y. Sup. 1987); *see also Mowbray v. Waste Mgmt Holdings*, 45 F. Supp.2d 132, 137 (D. Mass. 1999) ("[P]roof of reliance is unnecessary when the existence of a contractual warranty is undisputed."). Requiring IP to prove reliance upon an express warranty that it bargained for to be part of the written contract would be wasteful.

We hold as a matter of law that AELLC's section 2.02(f) warranty was false when made because AELLC was in breach of the Rio Alto Contract as a result of its failure to fulfill two of the conditions precedent to that contract.

C. Section 6.01(j) of the ESA

The last contract provision that IP sues upon is section 6.01(j), which imposes certain obligations on AELLC with respect to its contracts with third parties. Section 6.01(j) states in relevant part:

> [AELLC] will not terminate or materially modify the . . . Rio Alto natural gas supply agreement[] without [IP]'s prior approval, which shall not be

> unreasonably withheld or delayed. [AELLC] shall notify [IP] of any such modification or termination no later than fifteen (15) days before the proposed effective date of such modification or termination . . ..

IP contends that AELLC terminated or at least materially modified the Rio Alto Contract. It is indisputable that Rio Alto *actually* terminated the contract. In our February 9, 2001, Order, however, we held that "a set of facts may exist whereupon IP can prove that AELLC *constructively* terminated the contract . . .."

AELLC's obligations (e.g. to purchase natural gas) under the Rio Alto Contract were subject to the fulfillment of certain conditions precedent. AELLC did not fulfill two of the conditions precedent by the required deadlines. Accordingly, on April 7, 1998, Rio Alto sent a letter to AELLC stating that it was terminating the contract upon thirty days notice effective May 8, 1998. In the April 7 letter, Rio Alto also informed AELLC that it could avoid termination of the contract by exercising its contractual right to waive the remaining unfulfilled conditions precedent prior to May 8. In other words, AELLC could have avoided termination of the Rio Alto Contract by agreeing to become obligated under the contract, notwithstanding that two conditions precedent were never fulfilled.

In addition to its primary defense that it did not actually terminate the Rio Alto Contract, AELLC raises two additional arguments. First, AELLC argues that section 6.01(j) does not apply to the Rio Alto Contract situation because AELLC never

intended to cause the termination of the contract. Second, AELLC argues that it did give IP notice of the Rio Alto situation. Both arguments fail.

AELLC argues that, since it never intended that the Rio Alto Contract be terminated, it was under no duty to provide IP with fifteen days notice under section 6.01(j). AELLC does not and cannot reference any part of the ESA in support of this novel argument. Section 6.01(j) does not differentiate between intentional and accidental terminations.

After arguing that it never intended that the Rio Alto Contract be terminated, AELLC claims that it nevertheless gave IP notice of the "Rio Alto [s]ituation" as required by section 6.01(j). In support of this defense, AELLC alleges that its president, Mr. Polsky, "orally advised [IP] of the 'difficulty' AELLC was having with Rio Alto and that he thereafter kept [IP] informed as the situation was 'unfolding.'" AELLC's Opp. at 19. Because section 12.02 of the ESA requires any notification under section 6.01(j) to be *in writing*, we find this alleged oral notification to be deficient.

Whether or not AELLC's noncompliance with the conditions precedent and subsequent failure to waive them constitutes a constructive termination of the Rio Alto Contract presents a genuine issue of material fact that cannot be determined for either party on summary judgment.

D. Additional Purported Defenses to the Breach of Contract Claims

As a universal defense to all of IP's breach of contract claims, AELLC argues that sections 10.02(e) and 10.06(b)(i) of the ESA and Amended ESA bar IP from pursuing any of its contract claims. Section 10.02(e), in short, states that any false representation or warranty furnished by AELLC is an event of default unless AELLC cures the deficiency within thirty days notice after IP gives notice of the deficiency. At the very least, IP gave AELLC notice when it filed this action on October 10, 2000. Over two years have passed, and there has been no cure. Section 10.02(e) does not bar IP's claims.

With respect to AELLC's affirmative defense under section 10.06(b)(i), AELLC cannot now raise this defense because it never raised it in its Answer. *See* Fed. R. Civ. P. 12(b) ("Every defense, in law or fact, . . . shall be asserted in the responsive pleading . . ."). Notwithstanding AELLC's waiver, we find that section 10.06(b)(i) does not require IP to notify AELLC of a dispute within a reasonable time. Section 10.06(b)(i) only provides the ground rules of an *optional* method of dispute resolution. *See* ESA § 10.06(b)(i) ("Upon the occurrence of a Dispute, either Party *may* deliver notice to the other Party requesting that the Dispute be referred to the senior management of the Parties.") (emphasis added).

Because AELLC breached section 2.02(f) of the Amended ESA, IP is entitled to summary judgment on Count I.

### III. Negligent Misrepresentation

AELLC moves for summary judgment as to IP's negligent misrepresentation claim. IP's negligent misrepresentation claim is based upon alleged affirmative misrepresentations as well as omissions of truth during the spring of 1998 prior to executing the Amended ESA and Amendment No. 1. All of the allegations involve the already discussed Rio Alto Contract situation. To the extent that the alleged misrepresentations were written into the Amended ESA, they sound in contract, not tort, and are not actionable under a negligent misrepresentation theory. To the extent that the alleged misrepresentations were made orally, they are precluded by the integration clauses in the Amended ESA and Amendment No. 1. Under Maine law, a party cannot rely on representations made during the negotiation of a contract if the contract includes an integration clause. *Stanley v. Miro*, 540 A.2d 1123 (Me. 1988) (affirming trial court's judgment against plaintiff on her negligent and innocent misrepresentation claims because of integration clause in contract).

## CONCLUSION

Based on the foregoing analysis, we grant IP's motion for summary judgment as to liability under Count I, and we grant AELLC's motion for summary judgment on Count II. IP's motion to strike is denied.

_____
Charles P. Kocoras
Chief Judge
United States District Court

Dated: November 7, 2002