Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6215 | **DATE** | 12/18/2002 |
| **CASE TITLE** | Intl Paper Co vs. Androscoggin Energy | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ■ Status hearing set for 2/4/2003 at 9:30 A.M..
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Ruling held. **ENTER MEMORANDUM OPINION:** Defendant's motion (Doc 98-1) to reconsider is denied. Plaintiff's motion for leave to file surreply is denied as moot. Ruling set for December 19, 2002 is stricken.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | 5 number of notices | Document Number |
| | Notices mailed by judge's staff. | | DEC 19 2002 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 103 |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | 02 DEC 18 PM 1:47 | date mailed notice | |
| SCT | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INTERNATIONAL PAPER COMPANY, a New York corporation,

        Plaintiff,

vs.

ANDROSCOGGIN ENERGY LLC, a Delaware Limited Liability company,

        Defendant.

00 C 6215

DEC 19 2002

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on a motion to reconsider. Pursuant to Rule 59(e), Defendant Androscoggin Energy LLC ("AELLC") moves to alter or amend our order granting partial summary judgment in favor of Plaintiff International Paper Company ("IP"). For the reasons set forth below, we deny the motion.

## BACKGROUND

IP has a mill in Androscoggin, Maine, that demands a source of electric power and steam for it to operate. In 1996 and 1997 AELLC and IP negotiated a project (the "Project") in which AELLC would construct, own, operate, and maintain a facility at IP's mill for the purpose of producing electric power and steam for sale to IP and

103

electric power for sale to others. On May 12, 1997, AELLC's president, Michael Polsky, told IP that the price of steam could be "structured to remain stable and predictable using fixed price [gas] contracts." IP 56.1(a) Statement ¶ 6 (admitted). Polsky further stated: "By arranging long-term gas supply and transportation contracts, we will assure reliability and stable pricing of steam to IP. By matching the steam pricing to gas pricing, we provide a higher degree of predictability of returns to project investors." *Id.* During the negotiations regarding the Project, AELLC informed IP that it had ten-year contracts with four different natural gas suppliers under which natural gas would be available at fixed prices with fixed escalations. AELLC also provided IP with copies of the four contracts with the natural gas suppliers. One of these contracts, the Rio Alto Contract, was entered into between AELLC and Rio Alto Exploration, Ltd. ("Rio Alto"). The Rio Alto Contract provided AELLC with approximately one third of the fixed price natural gas to be used for the Project. The price of the gas was relatively low and Polsky even referred to the fixed price as at a "historic low." IP 56.1(a) Statement ¶ 19 (admitted).

On July 31, 1997, AELLC and IP entered into an Energy Services Agreement (the "ESA") under which AELLC would provide steam to IP for a period of twenty years. The price of the steam would be based, at least in part, on the average weighted

delivered price of natural gas pursuant to AELLC's fixed price, fixed escalation contracts with the four natural gas suppliers.

On March 26, 1998, AELLC sent a letter to Rio Alto acknowledging that it had failed to satisfy certain conditions precedent to the Rio Alto Contract and requesting an extension of time in which to comply with the conditions precedent. Rio Alto responded to the letter on April 7, 1998, stating that because of AELLC's non-compliance, Rio Alto was giving AELLC thirty days' notice that it would terminate the Rio Alto Contract on May 8, 1998. At that time, however, Rio Alto informed AELLC that it could avoid termination of the Rio Alto Contract by exercising its contractual right to waive all remaining conditions precedent prior to May 8, 1998. AELLC declined to waive them, and the Rio Alto Contract terminated on May 8, 1998. AELLC initiated an arbitration proceeding against Rio Alto to enforce the Rio Alto Contract, but the arbitration panel unanimously held that the contract was validly terminated on May 8, 1998. AELLC allegedly never informed IP of the Rio Alto Contract termination until August 31, 1998.

On May 29, 1998, after the Rio Alto Contract was terminated but before IP learned of the termination, AELLC and IP executed Amendment No.1 to the ESA ("Amended ESA"), which readopted the ESA as of that date.

The ESA, and therefore the Amended ESA, contained representations by AELLC that there were no pending or threatened actions, suits, arbitrations or the like against AELLC that would materially and adversely affect AELLC. They also contained representations that AELLC was not in breach of any material contracts, and that AELLC would not terminate or modify its contracts with the natural gas suppliers without providing notice to, and seeking approval from, IP.

Because of the termination of the Rio Alto Contract, AELLC has been and is likely to continue purchasing substitute gas at a higher price. Much of the increased price of gas available to AELLC has been passed on to IP in the form of increased steam prices. On October 10, 2000, IP filed suit against AELLC for breach of contract (Count I) and negligent misrepresentation (Count II) based on AELLC's alleged contractual and verbal misrepresentations with respect to the Rio Alto Contract. On November 7, 2002, we granted summary judgment for IP on the breach of contract claim because we found that, in light of the breached Rio Alto Contract, no reasonable jury could find that AELLC had not breached section 2.02(f) of the Amended ESA. Pursuant to section 2.02(f), AELLC made the following representation:

> [AELLC] is not . . . in breach of, in default under, or in violation of, any . . . contract, or other agreement by which it is bound, except for any such breaches, defaults or violations which, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the

business or financial condition of [AELLC] or its ability to fulfill its commitments hereunder.

AELLC now asks us to reconsider our ruling.

## LEGAL STANDARD

Rule 59(e) permits parties to file, within ten days of the entry of a judgment, a motion to alter or amend the judgment. Motions for reconsideration under Rule 59(e) are designed "to correct manifest errors of law or fact or to present newly discovered evidence." *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.*, 762 F.2d 557, 561 (7th Cir.1985). Such motions do not give a party the opportunity to rehash old arguments or to present new arguments "that could and should have been presented to the district court prior to the judgment." *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996) (citing *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir.1995)). Rather, a Rule 59(e) motion "must clearly establish either a manifest error of law or fact or must present newly discovered evidence" in order to be successful. *LB Credit Corp.*, 49 F.3d at 1267 (7th Cir.1986) (quoting *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986)). The decision of whether to grant or deny a Rule 59(e) motion "is entrusted to the sound judgment of the district court." *In re Prince*, 85 F.3d 314, 324 (7th Cir. 1996).

## DISCUSSION

AELLC's motion to reconsider contests our previous ruling on two grounds: (1) there is factual dispute as to whether the breach of the Rio Alto Contract "could reasonably be expected to have a material adverse effect on the business or financial condition of AELLC or its ability to fulfill its commitments under the [Amended ESA]" and (2) there is a factual dispute as to "whether IP provided reasonable notice of a breach of warranty to AELLC as required under the [Amended] ESA." AELLC Memo. at 2, 8.

### I. The Rio Alto Contract

AELLC contends that even if it breached the Rio Alto Contract, its section 2.02(f) warranty regarding breached contracts was not false because that warranty did not cover the Rio Alto Contract. AELLC defines the issue as "whether AELLC should reasonably have expected *in May 1998*, that the loss of the Rio Alto contract would have a material adverse effect." AELLC Memo. at 4. AELLC misunderstands the issue. In section 2.02(f) AELLC represented that it was not in breach of any contracts except for ones that "*could not reasonably be expected* to have a material adverse effect on the business or financial condition of [AELLC] or its ability to fulfill its commitments hereunder." Amended ESA § 2.02(f). Thus, the issue is not whether the loss of the Rio Alto Contract *should reasonably have been expected* to have a material

adverse effect, but rather whether the loss of the Rio Alto Contract *could not reasonably have been expected* to have a material adverse effect. Stated in another way, for AELLC to prevail, there must be a factual dispute as to whether it would have been *un*reasonable on May 29, 1998, to expect the loss of the Rio Alto Contract to materially adversely affect AELLC or its obligations under the Amended ESA.

IP offered evidence that it would have been reasonable to expect the loss of the Rio Alto Contract to have a material adverse effect. AELLC offered evidence that it would also have been reasonable to expect the opposite. What AELLC has not offered, however, is evidence that it would have been unreasonable to expect the loss of the Rio Alto Contract to have a material adverse effect.

The Rio Alto Contract, unless prematurely terminated as was ultimately the case, would have provided one-third of the fixed-price natural gas to the Project for several years. IP 56.1(a) Statement ¶ 18 (admitted). During negotiations of the original ESA, AELLC represented that contracts such as the one it had with Rio Alto enabled AELLC to "assure reliability and stable pricing of steam to IP." IP 56.1(a) Statement ¶ 6 (admitted). Regardless of whether natural gas prices would ultimately rise (as they did) or fall, the loss of the Rio Alto contract indisputably exposed IP to substantial market risks. It is this exposure to market risks that was materially adverse.

AELLC attacks this court of using hindsight in finding that the Rio Alto Contract loss was ultimately materially adverse, instead of limiting our analysis to the status quo on May 29, 1998, when the representation at issue was made. In our previous ruling we noted that AELLC, in suing its former counsel for negligence, represented that it suffered damages from the loss of the Rio Alto contract to be "at least $42.7 million" and "as much as $65.4 million." The fact that AELLC could ultimately be effected so gravely is indicative of how enormously significant the Rio Alto Contract was *as of May 29, 1998*, in eliminating potential market risks for several years.

AELLC also criticizes the court for stating that the Rio Alto Contract, but for its termination, would have provided AELLC with natural gas at a fixed, relatively low price. AELLC states that we did not cite to the record when making this finding. Additionally, AELLC states that there is no indication as to what relative means. Assuming AELLC read our entire previous ruling, it would have noticed that we stated that "[t]he price of natural gas [in the Rio Alto Contract] was relatively low and Polsky [(AELLC's president)] even referred to the fixed price as at a historic low. IP 56.1(a) Statement ¶ 19." Nov. 7, 2002, Order at 3. IP 56.1(a) Statement ¶ 19 is the citation, and relative means relative to the price of natural gas historically.

AELLC also criticizes us for inferring that since AELLC brought Rio Alto to arbitration to enforce the Rio Alto Contract after Rio Alto terminated the contract, AELLC must have believed the loss of the Rio Alto Contract would be materially adverse. One day before AELLC made the misrepresentation is section 2.02(f), it threatened Rio Alto that it would "secure a replacement supplier" and "institute arbitration or court proceedings to recover as damages any increased cost [it] incur[red] for gas as a result of [its] having to replace Rio Alto as a supplier." IP 56.1(a) Statement ¶ 35 (admitted). This statement, which was made by AELLC on May 28, 1998, is entirely inconsistent with AELLC's position that on May 29, 1998, it would have been unreasonable to expect the loss of the Rio Alto Contract to have a materially adverse effect. Clearly, AELLC was contemplating the potential for increased natural gas prices.

Despite this direct evidence that AELLC was concerned of having to replace the Rio Alto gas at increased market prices, AELLC argues that we made an inappropriate inference on summary judgment because other inferences could be made. AELLC then states:

> For example, if market-priced gas from a location other than Western Canada were more advantageous for the Project, as all of the experts were indicating in April and May 1998, AELLC could have taken gas under the Rio Alto contract and resold it for a profit in the Western Canada market. While this would not effect the Project, it would benefit AELLC.

AELLC's Memo. n.3. Even accepting this representation of AELLC's motive for bringing the arbitration as true, AELLC misses the mark. The Rio Alto Contract loss is materially adverse if it is materially adverse to AELLC's ability to fulfill its commitments to IP *or* if it is materially adverse to AELLC itself. Section 2.02(f) states that AELLC is not in breach of any contracts except ones that "could not reasonably be expected to have *a material adverse effect on the business or financial condition of Seller* or its ability to fulfill its commitments hereunder." Amended ESA § 2.02(f) (emphasis added). "Seller" is defined as AELLC in the very first sentence of the Amended ESA. Thus, AELLC's present representation that it wanted to perpetuate the Rio Alto Contract for its own self-interests without regard to the Project with IP actually supports our previous ruling.

No reasonable jury could find that on May 29, 1998, the loss of the Rio Alto Contract could not reasonably have been expected to be materially adverse to AELLC or to AELLC's ability to fulfill its contractual obligations to IP.

## II. Reasonable Notice

AELLC complains that our previous ruling "failed to even address the 'necessarily factual issue' of reasonable notice . . . ." AELLC Memo. at 9. AELLC claims that section 10.02(e) of the Amended ESA "unambiguously states that IP is required to provide AELLC with notice with respect to any false or misleading

representation or warranty that IP considers to be an Event of Default." AELLC Reply at 3. Rather than take AELLC's word for it, we will refer to the contract language itself. Section 10.02(e) defines an Event of Default as:

> Any representation or warranty furnished by [AELLC] in connection with this Agreement [that] was false or misleading in any material respect when made, unless (i) the fact, circumstance or condition that is the subject of such representation or warranty is made true with thirty (30) days after [IP] has given notice thereof to [AELLC];

Amended ESA § 10.02(e). The effect of section 10.02(e) is to provide AELLC thirty days time to cure any misrepresentation before it can be held liable for breach of contract. Notification is not an obligation imposed by section 2.02(e); it is merely a prerequisite to liability. As such, there is no basis for imposing an obligation on IP to provide notice within a reasonable time. AELLC acknowledges that it received notice on July 24, 2000. AELLC Memo. at 10. Over two-and-a-half years have passed, and there has been no cure.

## CONCLUSION

Based on the foregoing analysis, we deny AELLC's motion to reconsider.

Charles P. Kocoras
Chief Judge
United States District Court

Dated: DEC 18 2002