# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 6215 | **DATE** | 12/11/2003 |
| **CASE TITLE** | International Paper Company vs. Androscoggin Energy LLC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion. Based on the foregoing analysis, IP's motion for summary judgment is granted in part and denied in part. (157-1) Pretrial order to be submitted by 1/12/04.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | DEC 2 2 2003 date docketed | |
| ✓ | Docketing to mail notices. | | | 179 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TP | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL PAPER COMPANY, a New York Corporation, ) ) ) | | |
| Plaintiff, ) ) ) | | |
| vs. ) ) | 00 C 6215 | |
| ANDROSCOGGIN ENERGY LLC, a Delaware Limited Liability Company; POLSKY ENERGY CORPORATION OF MAINE, an Illinois corporation; and ANDROSCOGGIN ENERGY, INC., an Illinois corporation, ) ) ) ) ) ) ) | | |
| Defendants. ) | | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on Plaintiff International Paper Co.'s ("IP") motion for summary judgment on certain damages issues. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Many of the facts of this case have been previously set forth in detail in this court's opinion in International Paper Co. v. Androscoggin Energy LLC, 2002 WL

31507176 (N.D. Ill. 2002) ("Androscoggin I"). Only those facts relevant to this motion for summary judgment are summarized below.

IP has a mill in Androscoggin, Maine, that requires a source of steam for it to operate. In 1996 and 1997, IP and Defendant Androscoggin Energy LLC ("AE") negotiated a project (the "Project") in which AE would construct, own, operate, and maintain a facility at IP's mill for the purpose of producing electric power and steam for sale to IP and electric power for sale to others. During the negotiations, AE's president, Michael Polsky informed IP that AE had ten-year contracts with four different natural gas suppliers (the "Suppliers") under which natural gas would be available at fixed prices with fixed escalations. AE provided IP with copies of the contracts. One of these contracts was between IP and a gas supplier called Rio Alto. The Rio Alto contract initially provided AE with approximately one-third of the fixed price natural gas to be used for the Project. It is disputed whether AE represented to IP that Rio Alto gas would be available to the Project for at least ten years. In any event, the price of gas was relatively low at the time to the point that Polsky referred to the fixed price as being at a "historic low."

On July 31, 1997, AE and IP entered into an Energy Services Agreement ("ESA") under which AE would provide steam to IP for a period of twenty years. The ESA contained a pricing formula that calculated the price IP would pay for the steam

it purchased from AE. Under this formula, IP's steam price would be calculated based upon the "average weighted delivered price" of gas from the Suppliers or from different replacement sources. While the ESA provided that IP's steam price would be calculated based on AE's gas costs, the ESA contained no guarantee or promise that Rio Alto gas would be used in the steam billing formula.[1]

On March 26, 1998, AE sent a letter to Rio Alto acknowledging that it had failed to satisfy certain conditions precedent to their contract and requesting an extension of time in which to comply with the conditions precedent. On April 7, 1998, Rio Alto responded that because of AE's noncompliance, Rio Alto was giving AE thirty days notice that it would terminate their contract on May 8, 1998. At that time, Rio Alto also informed AE that it could avoid termination of the contract by exercising its contractual right to waive all remaining conditions precedent prior to May 8, 1998. AE declined this offer, and the contract terminated on May 8, 1998. AE later initiated an arbitration against Rio Alto to enforce the contract, but the panel unanimously held that the contract had been validly terminated on May 8, 1998. While the parties dispute

---

[1] IP controverts this contention. However, because IP fails to bolster its assertion with "specific references" to supporting documents, AE's statement is deemed admitted pursuant to Local Rule 56.1(b).

when IP first became aware of the termination of the Rio Alto contract,[2] IP knew of its termination by December 1, 1998. As of that date, IP had made no capital investment in the Project.

On May 29, 1998, AE and IP executed Amendment No. 1 to the ESA ("AESA"), which readopted the ESA as of that date. The AESA adopted representations contained in the ESA that AE was not in breach of any material contracts, and that AE would not terminate or modify its contracts with the Suppliers without providing notice to, and seeking approval from, IP. In particular AESA § 2.02(f) stated that:

> [AE] is not . . . in breach of, in default under, or in violation of, any . . . contract, or other agreement by which it is bound, except for any such breaches, defaults or violations which, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the business or financial condition of [AE] or its ability to fulfill its commitments hereunder.

Even though IP was aware of the loss of the Rio Alto contract by December 1, 1998, the parties went ahead with the Project. One year later, in December 1999, AE began delivering steam to IP. For seven months IP did not object to and paid AE for steam with a price based, in part, on the cost of replacement gas supplied by Duke Energy. The price of the Duke Energy replacement gas was higher than the price contemplated in the Rio Alto contract, and was passed on to IP in the form of higher

---

[2] In an August 31, 1998, letter from AE to IP, AE did inform IP that Rio Alto considered its contract with AE to have already been terminated. Def. App. Ex. L.

steam prices. It was not until July 24, 2000, that IP objected to AE charging a steam price based on the Duke Energy replacement supply. However, IP's increased steam costs did ultimately spawn the present lawsuit. Earlier in the course of this litigation, we held that as a matter of law AE had breached a contract with IP because AE's warranty in AESA § 2.02(f) "was false when made because [AE] was in breach of the Rio Alto Contract as a result of its failure to fulfill two of the conditions precedent to that contract." Androscoggin I at *5.

Based on AESA § 10.04, which provides for "Remedies Upon Default by [AE],"[3] IP now seeks summary judgment on four issues related to damages. IP moves for judgment as a matter of law that: (1) IP is entitled to recover, as a component of its damages, the loss of value to IP resulting from AE's breach of the AESA; (2) the appropriate measure of the loss of value to IP is the difference in IP's steam price resulting from the substitution of actual replacement gas prices for Rio Alto gas prices in the steam billing formula provided in the AESA; (3) IP is entitled to recover a variety of costs (attorneys' fees, expenses, etc.) reasonably incurred in the exercise of

---

[3] Section 10.04 provides that in the event of default by AE, IP may "[e]xercise all remedies available at law or equity or other appropriate proceedings, including bringing an action or actions from time to time for damages and expenses resulting from the Event of Default, which shall include all costs and expenses reasonably incurred in the exercise of its remedy (including reasonable attorneys' fees)."

its recovery; and (4) none of AE's affirmative defenses operates to bar or reduce IP's damages for AE's breach of AESA § 2.02(f). Pl. Mem. at 1.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R .Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the nonmoving party's case." Id. at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must consider the record as a whole in a light most

favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. Id. at 255; Bay v. Cassens Transport Corp., 212 F.3d 969, 972 (7th Cir. 2000). With these considerations in mind, we now turn to the present motion.

## DISCUSSION

### Damages Issues

IP first moves for judgment as a matter of law that it is entitled to recover, as one component of its damages, the loss of value to IP resulting from AE's false representation in the AESA. IP states that it is entitled to do so as a result of AESA § 10.04, which says that IP may "[e]xercise all remedies available at law . . . including bringing an action or actions . . . for damages and expenses resulting from the Event of Default." We determine that under Maine law[4] the language of this contract term is unambiguous, See American Protection Ins. Co. v. Acadia Ins. Co., 814 A.2d 989, 993 (Me. 2003), and that IP is entitled to pursue actions for damages that resulted from AE's breach. AE appears not to disagree. There is a sharp point of contention, however, concerning what damages accrued as a result of AE's breach.

To prevail in a breach of contract action under Maine law, a plaintiff must prove (1) breach of a material contract term, (2) causation, and (3) damages. Maine Energy

---

[4] We have already decided that Maine law will be used in resolving IP's breach of contract claims. Androscoggin I at *2.

Recovery Co. v. United Steel Structures, Inc., 724 A.2d 1248, 1250 (Me. 1999). IP has met its burden as to the first element, as we earlier determined that AE breached AESA § 2.02(f). Androscoggin I at *5. The Restatement (Second) of Contracts, upon which the Maine Supreme Court has relied, See Deering Ice Cream Corp. v. Colombo, Inc., 598 A.2d 454, 457 (Me. 1991), and which IP cites as an authority in this case, Pl. Mem. at 5, also states that causation is a essential element of recovery. In formulating the measure of damages for breach of contract, the Second Restatement says that the plaintiff's expectation interest is measured by "the loss in value to him of the other party's performance *caused by* [the breach] plus . . . any other loss, including incidental or consequential loss, *caused by the breach* . . . ." Restatement (Second) of Contracts § 347(a) and (b) (emphasis added). The Restatement further elaborates that "the injured party is limited to damages based on his *actual loss caused by the breach*." Id., cmt. e (emphasis added).

While Androscoggin I answered the question of breach, the opinion was silent as to the requisite causation element. Maine law makes clear that the question of causation is one for the jury. Maine Energy Recovery Co. at 1250. Based on the parties' moving papers and the record before us, genuine issues of fact exist concerning the causal connection between AE's breach and IP's increased steam costs. At the time the parties entered into the AESA, on May 29, 1998, AE had already lost its contract

with Rio Alto. IP knew this by December 1, 1998, if not earlier, and still decided to go ahead with the Project even though no capital investments had yet been made. AE's misrepresentation may have caused IP to sign the AESA, but based on the undisputed facts before us, it is not clear that AE's deceit was the cause of IP's increased steam costs. At the very least, this is a fact question that must be resolved by a jury. We therefore hold that as a matter of law, IP is entitled to recover any loss of value *resulting* from AE's breach. However, because IP has yet to establish that AE's breach was the cause of its losses, it is premature to rule on how those losses will be calculated. For this reason, IP's request for summary judgment on the measure of damages is denied.

**Attorneys' Fees**

According to AESA § 10.04(a), in the event of default by AE, IP may exercise remedies which include recovering "all costs and expenses reasonably incurred in the exercise of its remedy (including reasonable attorneys' fees)." Based on this contractual language, IP asserts that it is entitled to recover (1) attorneys' fees and expenses, (2) expert fees and expenses, and (3) internal costs and expenses. In our Order from April 25, 2003, we found that because the damages issue remained open, any determination of fees and costs would be premature. Consistent with our finding that IP had inappropriately "accelerated its 'right' to fees and costs" by withholding

steam payments to AE, id., we will defer ruling on IP's entitlement to fees and costs until the resolution of the damages issues. IP's motion for summary judgment as to entitlement to fees is thus denied.

**Affirmative Defenses**

IP's final request for summary judgment asks that we find that none of AE's affirmative defenses bars or reduces IP's damages for AE's breach of AESA § 2.02(f). Among the thirteen affirmative defenses advanced by AE, IP particularly seeks us to hold that AE's assertion that IP failed to mitigate damages is defective as a matter of law. IP first claims that its alleged failure to mitigate is irrelevant as a matter of law because under the UCC, any failure to mitigate is only a bar to consequential damages, which IP does not seek. IP bolsters this argument by citing authorities from various federal appellate courts, including the Seventh Circuit. However, as AE correctly points out, the "common law duty to mitigate damages survive[d] Maine's enactment of the Uniform Commercial Code in 1963." Schiavi Mobile Homes, Inc. v. Girondi, 463 A.2d 722, 724 (Me. 1983). Not differentiating between the various types of damages (expectation, consequential, etc.), "it has long been the rule in [Maine] that when a contract is breached, the nonbreaching party has an affirmative duty to take reasonable steps to mitigate his damages." Id.

Because we find IP's alleged failure to mitigate damages relevant as to AE's affirmative defenses, we must next determine if questions of fact exist concerning whether IP mitigated its losses following AE's contractual breach. In Maine, the "touchstone of the duty to mitigate is reasonableness," id. at 725, and whether the non-breaching party's actions were reasonable is a question for the jury. Lee v. Scotia Prince Cruises Ltd., 828 A.2d 210, 216 (Me. 2003). IP knew that AE would not have access to the cheaper Rio Alto gas by December 1, 1998. However, IP would not object to AE's steam prices until July 24, 2000. Based on these facts, we hold that a jury could question the reasonableness of IP's inaction and find that it failed to mitigate its damages during this period. Because a potential finding of failure to mitigate damages could bar or reduce IP's final damages award, its fourth summary judgment request is denied.

## CONCLUSION

Based on the foregoing analysis, IP's motion for summary judgement is granted in part and denied in part.

Charles P. Kocoras
Chief Judge
United States District Court

Dated: DEC 11 2003

-11-